TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00660-CV


NO. 03-98-00208-CV






David "Birny" Birnbaum, Appellant



v.



Alliance of American Insurers, et al., Appellees



AND



David "Birny" Birnbaum; John Cornyn, Attorney General of Texas; and


Elton Bomer, Commissioner of Texas Department of Insurance, Appellants



v.



National Association of Independent Insurers, et al., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NOS. 97-09206 & 97-09206-A, HONORABLE PETER M. LOWRY, JUDGE PRESIDING


AND HONORABLE PAUL R. DAVIS, JUDGE PRESIDING







 In the first cause of a consolidated appeal, David "Birny" Birnbaum appeals from
an order granting a temporary injunction on the application of several automobile insurance
companies and trade associations ("appellees"). (1) In the second cause, Birnbaum, joined by
Attorney General and Elton Bomer, (2) Commissioner of the Texas Department of Insurance (the
"Department"), appeals from a summary judgment granting a permanent injunction as requested
by appellees. Both the temporary injunction and the permanent injunction prohibit the Department
from releasing information to Birnbaum in response to his open records request. We will reverse
the summary judgment and dissolve the permanent injunction; we will modify the temporary
injunction order, affirming it as modified.


THE CONTROVERSY

 Texas law requires that motor vehicle operators establish their financial
responsibility. See Tex. Transp. Code Ann. § 601.051 (West 1999). Compliance typically
involves the purchase of an automobile liability-insurance policy. See id. § 601.071-.088; Office
of Pub. Ins. Counsel v. Texas Auto. Ins. Plan, 860 S.W.2d 231, 233 (Tex. App.--Austin 1993,
writ denied). Insurers are prohibited to engage in unfair discrimination by refusing to insure,
refusing to continue to insure, limiting the amount, extent, or kind of coverage available, or
charging an individual a different rate for the same coverage because of the individual's age,
gender, marital status, or geographic location. See Tex. Ins. Code Ann. art. 21.21-6, §§ 1, 3(b)
(West Supp. 1999) (emphasis added). 

 In order to allocate high-risk drivers among insurers, the 73d Legislature
established the Texas Automobile Insurance Plan Association ("TAIPA"). See Tex. Ins. Code
Ann. art. 21.81, § 2(a); see also Office of Pub. Ins. Counsel, 860 S.W.2d at 233 n.2. TAIPA is
a nonprofit corporation with members, all of which are authorized automobile insurers. See Tex.
Ins. Code Ann. art. 21.81, § 2(a). 

 The governing committee of TAIPA is responsible for making, amending, and
administering a "plan of operation," subject to the approval of the Commissioner of Insurance (the
"Commissioner"). See id. § 3(a), (c). The purpose of the plan is to provide automobile liability-insurance coverage for drivers who are unable to obtain such coverage in the open or voluntary
market. See id. § 1(4). The plan adopted by TAIPA contains an incentive program to encourage
TAIPA members to write insurance on a voluntary basis for consumers in "underserved" (3)
geographic areas, reducing thereby the need for TAIPA to assign high-risk drivers to specific
insurers. (4) See id. § 3(e). An insurer who voluntarily sells automobile insurance in underserved
areas is eligible for credits against such insurer's quota of TAIPA assignments. The TAIPA plan
of operation establishes the method for calculating basic quotas and credit-adjusted quotas. (5) See
20 Tex. Reg. 334 (1995). 

 The Texas Private Passenger Automobile Statistical Plan ("Statistical Plan"),
promulgated by the Department, requires the reporting of certain information necessary for the
calculation of quotas and credits. Four reports are required to be submitted to the Department by
all companies "writing direct private passenger automobile business in Texas." The four reports
are: the Annual Aggregate Experience Report, Annual Reconciliation Report, Quarterly Market
Report, and Quarterly Detailed Experience Report. 

 Birnbaum filed with the Department on October 29, 1996, an open-records request
under the Texas Public Information Act seeking information in the Quarterly Market Reports for
the first and second quarters of 1996. See Tex. Gov't Code Ann. § 552.021 (West 1994 & Supp. 
1999). The Quarterly Market Reports list by ZIP Code (6) information concerning written
premiums, (7) policy and membership fees, number of vehicles on policies at the end of the previous
quarter, number of vehicles on policies at the end of the current quarter, and changes in the
number of vehicles insured (8) for bodily injury liability and collision coverages. According to
Department rules, information related to "the number of average vehicles on policies in force by
company by ZIP Code" shall be available upon request in order that TAIPA, insurers, and the
public may "make the necessary credit calculations and allow all interested parties to monitor
which ZIP Code may be underserved in the future." 28 Tex. Admin. Code § 5.206(h) (1998). 

 Pursuant to Government Code section 552.301, the Department requested from the
Attorney General a decision on whether the reports fell within any of the several exceptions to
required disclosure. See Tex. Gov't Code Ann. §§ 552.301, .101-.123 (West 1994 & Supp.
1999). The Attorney General decided initially that the reports of some of the companies were
excepted from mandatory disclosure as either trade secrets or as commercial or financial
information. See Tex. Att'y Gen. ORD-0301 (1997); see also Tex. Gov't Code Ann. § 552.110
(West 1994). The Department requested that the Attorney General reconsider his decision. The
Attorney General held again that the requested information was excepted from disclosure, but
because Birnbaum alleged that the Department had previously released similar information, the
Attorney General instructed the Department to decide whether to disclose the reports voluntarily. 
See Tex. Gov't Code Ann. § 552.007 (West Supp. 1999).

 The Department decided to release the information and appellees sued to enjoin the
disclosure. After a pre-trial hearing, the district court determined the reports were probably
protected from mandatory public disclosure under exceptions in the Texas Public Information Act
that pertain to trade secrets, confidential commercial or financial information, and information
"contained in or relating to examination, operating, or condition reports prepared by or for an
agency responsible for the regulation or supervision of financial institutions or securities, or both." 
See Tex. Gov't Code Ann. §§ 552.110, .112 (West 1994). Finding that appellees would sustain
immediate and irreparable harm if the reports were released to the public, the district court
enjoined the Department pendente lite from releasing the reports. Birnbaum appealed to this
Court.

 While Birnbaum's appeal from the temporary injunction was pending, the district
court decided the merits of the case by ruling on appellees' motion for summary judgment. The
district court determined the Quarterly Market Reports were excepted from mandatory public
disclosure as information relating to the regulation of financial institutions or securities. See Tex.
Gov't Code Ann. § 552.112(a). A partial summary judgment was granted on this basis alone and
the Department was permanently enjoined from releasing the reports. Birnbaum's motion to sever
the partial summary judgment and make it the subject of a separate action was granted. Birnbaum
and the State officials then appealed from the summary judgment order.

DISCUSSION AND HOLDINGS

Permanent Injunction

 The trial court ruled summarily that the Quarterly Market Reports are excepted
from mandatory disclosure, as a matter of law, pursuant to section 552.112 of the Texas Public
Information Act, and enjoined their release to Birnbaum.

 Section 552.112 provides an exception for "information contained in or relating to
examination, operating or condition reports prepared by or for an agency responsible for the
regulation or supervision of financial institutions or securities, or both." Tex. Gov't Code Ann.
§ 552.112. Appellants Birnbaum and the State officials contend the exception does not apply to
the Quarterly Market Reports. Birnbaum argues that the reports cannot be "operating or condition
reports" because they do not provide a complete picture of the financial status or solvency of the
affected insurance companies. The State officials assert that there is at least a factual dispute,
precluding summary judgment, over whether the Quarterly Market Reports are "operating or
condition reports." In addition, Birnbaum disputes that the insurance companies are "financial
institutions" within the meaning of the exception. (9) The State officials contend in addition that even
if the Quarterly Market Reports come within section 552.112, the Department may nevertheless
elect to release the information at its discretion.

 Whether the Quarterly Market Reports are "operating or condition reports" of a
"financial institution," within the meaning of section 552.112, is a matter of statutory
construction. The term "financial institution" is not statutorily defined for purposes of section
552.112. Words that are not defined in a statute are generally given their ordinary meaning. See
Tex. Gov't Code Ann. § 312.002(a) (West 1998); Tijerina v. City of Tyler, 846 S.W.2d 825, 827
(Tex. 1992).

 Birnbaum argues that the legislature ordinarily excludes insurers when defining the
term "financial institution." This conclusion is based on a survey of fifteen Texas statutes that
exclude insurers from the term "financial institutions." (10) Birnbaum concedes that there are two
"aberrational" statutes that do include insurance companies within the definition of "financial
institutions," (11) but attempts to distinguish these statutes on the ground that the definition would
clearly exclude automobile insurers even if other insurers were included.

 Appellees rejoin that insurance companies are inherently "financial institutions" by
virtue of their services, which consist of accepting premiums, investing the funds, and paying out
money to customers in the form of claim payments. Appellees also provide two dictionary
definitions that include insurance companies among examples of "financial institutions." (12) On
these grounds, appellees assert they have established that the ordinary meaning of "financial
institutions" includes insurance companies.

 The reasons marshaled by the parties prove only that the term "financial institution"
admits of more than one ordinary meaning. The statutes cited by Birnbaum do not control in this
instance. Each such statute defines "financial institution" in a statutory context that does not
logically pertain to insurance companies. (13) 

 Nor are we persuaded by appellees' dictionary definitions. At least one of the
definitions reflects merely the existence of a federal statutory definition of "financial institution." 
See Black's Law Dictionary 630 (6th ed. 1990) (citing 31 U.S.C.A § 5312; Uniform Probate Code
§ 6-101(3)). Moreover, two reputable dictionaries contain no definition of "financial institution,"
suggesting that the expression, as such, has no certain meaning in ordinary usage. See The
American Heritage Dictionary of the English Language (William Morris ed., 1973); The Random
House College Dictionary (revised ed., 1984).

 We conclude that the meaning of the term "financial institution," as used in the
statute, is uncertain as to whether it was intended to include insurance companies. In deciding the
issue, we must therefore give the statute a reasonable construction that is consistent with the whole
of the statute and its purpose and objective. See Ex parte Pruitt, 551 S.W.2d 706, 709 (Tex.
1977); City of Mason v. West Texas Utils. Co., 237 S.W.2d 273, 278 (Tex. 1951); Fleming Foods 
v. Sharp, 951 S.W.2d 278, 281 (Tex. App.--Austin 1997, pet. granted).

 We find at the beginning of the statute a broad statement of general legislative
intent. Section 552.001(a) articulates the policy and purpose of the Texas Public Information Act:

[I]t is the policy of this state that each person is entitled, unless otherwise expressly
provided by law, at all times to complete information about the affairs of
government and the official acts of public officials and employees. . . . The people
insist on remaining informed so that they may retain control over the instruments
they have created. The provisions of this chapter shall be liberally construed to
implement this policy. 



Tex. Gov't Code Ann. § 552.001(a) (West 1994) (emphasis added). In addition to this statement 
of a general policy, the legislature indicated a wish that the statute "be liberally construed in favor
of granting a request for information." Id. § 552.001(b).

 In light of the clearly expressed general purpose of ensuring that the public retains
effective control of government, appellees bear a significant burden of persuasion that the
legislature intended an expansive interpretation of a statutory exception that operates against the
general purpose of the statute.

 Appellees assert that the longstanding position of the Attorney General--that
insurance companies are "financial institutions" within the meaning of section 552.112--must be
presumed to have been understood by the legislature and implicitly adopted each time the statute
was reenacted. We disagree. The well-settled rule is that a legislature presumably adopts judicial
interpretations of an act when a statute is reenacted without material change. See Coastal Indus.
Water Auth. v. Trinity Portland Cement Div., Gen. Portland Cement Co., 563 S.W.2d 916, 918
(Tex. 1978). Attorney General opinions are not judicial interpretations; they are not controlling
on the courts. See Commissioners Court v. Agan, 940 S.W.2d 77, 82 (Tex. 1997); City of San
Antonio v. Texas Att'y Gen., 851 S.W.2d 946, 950 (Tex. App.--Austin 1993, writ denied) ("The
attorney general's opinions . . . are purely ministerial and advisory."). Nor are they controlling
on the legislature. See 2B Sutherland, Statutory Construction § 49.09, at 69 (5th ed. 1992)
("When Congress reenacts an earlier statute, the presumption is that it knows and approves prior
judicial constructions of that act by state courts.") (emphasis added). Furthermore, nothing
suggests that the legislature was aware of the Attorney General's interpretation of "financial
institution" when it reenacted the statute. "[R]eenactment of [a statute] to which an administrative
interpretation or regulation pertains should not make the administrative ruling automatically
binding as law without evidence that clearly manifests such a purpose." Id. at 69-70 (emphasis
added). (14)

 The Attorney General's position that the term "financial institutions" includes
insurance companies was based in part on an analogy to an unrelated statute. (15) The Attorney
General also relied on the definition provided in Webster's Third International Dictionary, which
we have rejected as authoritative in this context. Finally, the Attorney General looked to the
legislative history of the Act, and found the testimony of an insurance commissioner wherein he
requested that an exception be made for insurance companies. Nothing indicates that the
legislature intended any particular response to that request in the language that body chose to place
in the statute. The insurance industry's position on how the statute should be interpreted is
therefore not persuasive. We decline to follow the Attorney General's interpretation.

 With nothing definite before us regarding the legislature's intention, we look for
guidance to the analogous federal Freedom of Information Act. Section 552.112 was modeled
after exception eight of the Freedom of Information Act. See 5 U.S.C. § 552(b)(8) (1996). 
Federal decisions construing exceptions to the Freedom of Information Act are instructive in our
interpretation of the Texas Public Information Act. See A & T Consultants, Inc. v. Sharp, 904
S.W.2d 668, 676 (Tex. 1995); City of Garland v. Dallas Morning News, 969 S.W.2d 548, 557
(Tex. App.--Dallas 1998, writs granted).

 In an opinion interpreting the federal statute, the Court of Appeals for the District
of Columbia noted the sparse legislative history that accompanied exception eight. See Consumers
Union of United States, Inc. v. Heimann, 589 F.2d 531, 539 (D.C. Cir. 1978). However, the
court was able to discern two reasons for the exception. The exception was intended primarily
"to insure the security and integrity of financial institutions, for the sensitive details collected by
Government agencies which regulate these institutions could, if indiscriminately disclosed, cause
great harm." Id. at 534 n.10 (quoting U.S. Code Cong. & Admin. News 1966, pp. 2418, 2428). 
Exception eight was designed also to encourage compliance with government regulations, by
ensuring the confidentiality of information provided by financial institutions pursuant to those
regulations. See id.

 Neither purpose is furthered in this instance by protecting Quarterly Market Reports
from disclosure. First, the harm that appellees fear is competition, not harm that involves directly
the security of the institution itself or the industry. (16) There is no showing or contention that
release of the Quarterly Market Reports is likely to injure the security or integrity of insurance
companies. Second, the objective of encouraging compliance with government regulations is for
the benefit of the government, not the regulated institutions. Because of the exception,
government may withhold from mandatory disclosure information supplied by private entities on
the ground that disclosure might jeopardize government's ability to collect such information in the
future. But here the State officials wish to disclose the reports. They apparently have determined
that the public interest in disclosure outweighs any applicable regulatory interest in assuring that 
regulated insurers comply with reporting requirements. 

 Finally, section 552.112 is a permissive exception only. Even if the exception
applies to the Quarterly Market Reports, the State officials may reject the exception and disclose
the information to the public. This power is given in section 552.007, which states as follows: 
"This chapter does not prohibit a governmental body . . . from voluntarily making part or all of
its information available to the public, unless disclosure is expressly prohibited by law or the
information is confidential under law." Tex. Gov't Code. Ann. § 552.007(a) (West Supp. 1999). 
A government agency may therefore release any information that is not expressly prohibited from
release on the grounds indicated. See id. §§ 552.110, .112; Industrial Found. of the South, Inc.,
540 S.W.2d 668, 682-83 (Tex. 1976). 

 Appellees argue that a better reading of section 552.007 would allow the
government to disclose its own documents, but not documents in which there is a third-party
property or privacy interest. Appellees advocate a distinction not suggested by the language of
the statute. Some kinds of information given to a State agency will undoubtedly be confidential. 
For example, if the appellees' filings amounted to a trade secret or confidential or privileged
information under section 552.110, they would be confidential under law and therefore could not
be disclosed under section 552.007. But we find no authority for the proposition that section
552.112 itself creates a class of information that is confidential under law because it was furnished
to the State by private entities. The fact that information is excepted from mandatory disclosure
does not necessarily render it confidential. When the legislature has intended to make information
confidential, it has not hesitated to so provide in express terms. See, e.g., Tex. Ins. Code Ann.
art. 1.24D (making explicit the confidentiality of underwriting guidelines and stating that a
violation of this section is a violation of the open-records law); Tex. Gov't Code Ann.
§ 552.113(a), (c) (West Supp. 1999) (excepting geological or geophysical information that is
defined as confidential); Tex. Health & Safety Code Ann. § 82.009 (West 1992) (ensuring 
confidentiality of medical records).

 Because we hold as a matter of law that insurance companies are not "financial
institutions" within the meaning of section 552.112, (17) and that section 552.112 is a permissive
exception that government may waive in its discretion, we reverse the summary judgment and
dissolve the permanent injunction. See Risk Managers Int'l v. State, 858 S.W.2d 567, 569-70
(Tex. App.--Austin 1993, writ denied).


Temporary Injunction

 Our reversal of the permanent-injunction order moots one ground for the temporary
injunction, but the other ground--that the Quarterly Market Reports are trade secrets--survives. 
Because we find the district court did not abuse its discretion in granting a temporary injunction
on this ground, we affirm the temporary injunction order. We will explain our reasons.

 The purpose of a temporary injunction is to preserve the status quo of the subject
matter of the suit pending final disposition of the case on its merits. See Janus Films, Inc. v. City
of Fort Worth, 358 S.W.2d 589, 589 (Tex. 1962). To obtain a temporary injunction, the applicant
must show a probable right to the relief sought and probable injury in the interim before trial. See
Niemeyer v. Tana Oil & Gas Corp., 952 S.W.2d 941, 943 (Tex. App.--Austin 1997, no writ). 
Probable injury is demonstrated by evidence of imminent harm, irreparable injury, and an
inadequate legal remedy. See Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 597 (Tex.
App.--Amarillo 1995, no writ). A trial court order granting a temporary injunction may be
reversed only for a clear abuse of discretion. See Walling v. Metcalfe, 863 S.W.2d 56, 57-58
(Tex. 1993); Iranian Muslim Org. v. City of San Antonio, 615 S.W.2d 202, 208 (Tex. 1981).

 Equal Access. In his first issue on appeal from the temporary injunction, Birnbaum
argues that the trial court abused its discretion by denying him access to the Quarterly Market
Reports while permitting their release to TAIPA. In granting the temporary injunction, the trial
court found that appellees would suffer immediate, irreparable injury if the Department released
to "the public" Quarterly Market Report information for the first quarter of 1996, the second
quarter of 1996, or any subsequent quarter. To prevent this harm, the temporary injunction order
restrains the Department from directly or indirectly releasing the Quarterly Market Report
information to any person or entity but provides that the Department


may provide access to the number of vehicles on policies at end of previous and
current quarters of the Quarterly Market Report Data to the Texas Automobile
Insurance Plan Association and Auto Insurance Plan Service Office (AIPSO), only,
solely to the extent required for making calculations necessary to implement the
incentive programs described section 3(e) of the Texas Insurance Code, article
21.81.



 Appellees contend the temporary injunction allows the Department and "its
statistical agents" to perform calculations necessary to the implementation of incentive programs
"without public disclosure." Appellees argue that if the Quarterly Market Report information is
released to a member of the public such as Birnbaum, competitors will be able to acquire the
information, ascertain appellees' marketing strategies, and develop their own marketing plans to
appellees' detriment. Birnbaum contends that because the temporary injunction allows the
Department to provide the information to TAIPA, (18) an association of automobile insurers and a
member of the public, the information is necessarily available to the appellees' competitors.

 TAIPA's fifteen-member governing body consists of eight persons elected by the
member insurers, five public members nominated by the Office of Public Insurance Counsel and
selected by the Commissioner of Insurance, and two local recording agents. See Tex. Ins. Code
Ann. art. 21.81, § 2(b) (West Supp. 1999). TAIPA is thus a private entity, in a sense, with a
governing body that is largely private. See Texas Boll Weevil Eradication Found., Inc. v.
Lewellen, 952 S.W.2d 454, 486 (Tex. 1997) (Hecht, J., concurring in part, dissenting in part, and
concurring in the judgment). TAIPA's powers are limited. See id. The entity's powers,
however, are exercised for a public purpose and in the public interest. In accordance with the plan
of operation, TAIPA may make assessments against member companies in proportion to their
writing of motor-vehicle liability insurance in Texas, collect funds from member companies to
provide for operation of the association, and report to the Commission any failure to pay
assessments. See id. 

 Through the performance of these and other statutory duties, TAIPA advises and
assists the Commission. See Lewellen, 952 S.W.2d at 486. Pursuant to its policy implementation
role, TAIPA receives information required to be filed with the Commissioner under the Texas
Private Passenger Automobile Statistical Plan. It is therefore incorrect to refer to TAIPA as a
"statistical agent." Statistical agents are assigned the task of collecting information from reporting
insurers under a statistical plan. See Tex. Ins. Code Ann. art. 21.69(d) (West Supp. 1999). The
Texas Private Passenger Automobile Statistical Plan designates the Acxiom Corporation as a
statistical agent for Quarterly Market Report.

 We discern no basis for the trial-court order giving TAIPA access to the
information in the Quarterly Market Reports. None of TAIPA's legislatively prescribed duties
appear to entitle it to specific data elements contained in the Quarterly Market Reports. See Tex.
Ins. Code Ann. art. 21.81, § 3(a) (West 1994). In fact, the only authority for TAIPA's access to
the reports is TAIPA's plan of operation, authored by TAIPA itself. The trial court tailored a
narrow ruling, designed to ensure that the information could be obtained only to the extent
required for implementing the incentive program. In our view, this order appears to violate
section 552.222 of the Act, which states that a "government body may not inquire into the purpose
for which information will be used." Tex. Gov't Code Ann. § 522.222(b) (West Supp. 1999); see
also A & T Consultants, 904 S.W.2d at 676 ("[W]e may not consider the requesting party's
purpose or use for the information."). 

 Appellees argue that there is no evidence that TAIPA is a public requestor of
information. We do not find this distinction persuasive. The trial court apparently perceived
some room for abuse if the reports were disclosed to TAIPA with no instruction limiting their use. 
 It is also contended that there is no evidence that the TAIPA board or TAIPA members must have
access to the information to make the calculations necessary to implement the incentive program. 
We are therefore hard-pressed to understand why TAIPA should receive the Quarterly Market
Report information at all, particularly in light of the trial court's finding that appellees probably
faced irreparable harm at the hands of competitors, who make up the membership of TAIPA. 
TAIPA's plan of operation requires that company-specific information be turned over to TAIPA. 
However, if the information is truly confidential under section 552.110, as appellees maintain, a
private entity cannot defeat the statute by ordering its disclosure, even when it is acting as a
governmental body. (19) Cf. Indus. Found. of the South, Inc., 540 S.W.2d at 677 ("[W]e do not
believe that a governmental agency may bring its information within [the confidentiality exception]
by the promulgation of a rule."). It is within our discretion to modify an injunction that is
overbroad. See T-N-T Motorsports v. Hennessey Motorsports, 965 S.W.2d 18, 25 (Tex.
App.--Houston [1st Dist.] 1998, no writ h.). We therefore modify the trial court order to prohibit
release of the Quarterly Market Report information to TAIPA. (20) 

 Standing. Birnbaum argues in his second and third issues on appeal that the trial
court was without jurisdiction to prohibit release of information contained in reports furnished by
insurers not represented in the suit, that is to say, insurers who are not members of the National
Association of Independent Insurers or the Alliance of American Insurers, and who are not
otherwise parties. Birnbaum also contends that the trial court exceeded its jurisdiction with respect
to members of the association who are not parties to the lawsuit. Because the question of whether
the Quarterly Market Reports are trade secrets depends upon a determination of whether
competitive harm will result from release of the information therein, Birnbaum argues that the
presence of each affected insurer is required to make a claim of individual harm. Appellees rejoin
that the Quarterly Market Reports are excepted from disclosure under section 552.112, pertaining
to the operating reports of financial institutions, and they are therefore categorically excepted from
disclosure. Consequently, all insurers, whether or not they are members of the insurance and
trade associations, will be protected.

 "It is a fundamental rule of law that only the person whose primary legal right has
been breached may seek redress for an injury." Nobles v. Marcus, 533 S.W.2d 923, 927 (Tex.
1976). In order to have standing, a party bringing an action must have a justiciable interest in the
subject of the action. See Williams v. Anderson, 850 S.W.2d 281, 283 (Tex. App.--Austin 1993,
writ denied). A trial court does not have subject-matter jurisdiction over an action brought by a
party without standing. See State Bd. v. Gomez, 891 S.W.2d 243, 245 (Tex. 1994); Texas Ass'n
of Bus. v. Air Control Bd., 852 S.W.2d 440, 445 (Tex. 1993). "If the district court lacks
jurisdiction . . . then its decision would not bind the parties." Gomez, 891 S.W.2d at 245.

 We hold that the trial court exceeded its jurisdiction when it enjoined the release
of records belonging to persons not parties to this lawsuit. We have ruled that the Quarterly
Market Reports are not excepted from mandatory public disclosure under section 552.112. The
only remaining ground for excepting the reports from disclosure, therefore, is section 552.110,
pertaining to trade secrets and confidential and privileged commercial and financial information. 
The Attorney General, before rendering his opinion on the request for disclosure of the Quarterly
Market Reports, invited the 205 insurance companies affected by the request for disclosure to
submit reasons why the information should not be released. Several did not respond to the
Attorney General's letter, and several are not parties here. Appellees lack standing to assert
claims and seek relief on behalf of the affected nonparty insurers, because appellees have no legal
or equitable interest in the Quarterly Market Reports furnished by those insurers. (21) We therefore
hold the trial court exceeded its jurisdiction when it enjoined the release of records of insurers who
were not parties. We modify accordingly the temporary injunction. 

 Appellees refer by analogy to Texas Ass'n of Business v. Air Control Board, 852
S.W.2d 440 (Tex. 1993). In Texas Ass'n of Business, the Supreme Court held unconstitutional
certain statutes that required payment of penalties as a condition to obtaining judicial review. 
Appellees argue that it would be absurd to conclude that business entities not represented by the
Texas Association of Business would be required to comply with an unconstitutional statute. 
Appellees' argument is inapposite. The statute in question in Texas Ass'n of Business applied
categorically to all business entities. Section 552.110 is not a categorical exemption for a specific
kind of information or document. Instead, it is a fact-specific exemption for information that is
found to be a trade secret or privileged and confidential commercial or financial information. 
Moreover, in light of the legislative suggestion that we should construe the statutory provisions
liberally in favor of disclosing information, we construe section 552.110 to be an affirmative
exception, meaning that the party wishing to prevent disclosure bears the burden of showing that
the exception applies. Nothing in the record suggests that insurers other than appellees object to
the release of the information. 

 Birnbaum also contends that the injunction unlawfully binds members of the
appellee associations. In Texas Ass'n of Business, the Texas Supreme Court established a three-part test for allowing an association to maintain an action on behalf of its members. According
to this test, an association may maintain an action on behalf of its members when 1) its members
could otherwise sue on their own; 2) the interests the association seeks to protect are germane to
the organization's purpose; and 3) neither the claim asserted nor the relief sought requires the
participation of individual members in the lawsuit. See Texas Ass'n of Bus., 852 S.W.2d at 447
(adopting the test from Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333,
343 (1977)).

 Birnbaum disputes that appellee associations have met the third element of the test. 
He argues that whether the Quarterly Market Reports of a specific company amount to trade
secrets or privileged and confidential commercial or financial information depends upon a factual
showing of specific harm that would probably result from release of the reports. Because the
existence of competitive harm is peculiar to each company, the participation of individual
insurance companies is required to establish a claim of harm.

 The appellees' position is that release of the Quarterly Market Reports will allow
competitors to acquire a complete picture of a particular company's operations, detailed by small
geographic units. Competitors will thus be relieved of the burden of making demographic studies,
or creating new and innovative ways to market insurance. Instead, they need only review each
other's Quarterly Market Reports to determine the success of marketing strategies in those areas.

 Appellees produced an expert witness, Dr. Finis Welch, who testified that all
automobile insurers in Texas could face competition, and the release of Quarterly Market Report
information could harm insurance companies by providing competitors with unique detailed
information about a company's success by zip code. Based on Dr. Welch's testimony, the trial
court found a sufficient risk of competitive harm to enjoin release of the Quarterly Market Reports
until a trial could be held on the merits.

 In Texas Ass'n of Business, the Texas Supreme Court observed that where an
association "seeks only prospective relief, raises only issues of law, and need not prove the
individual circumstances of its members to obtain that relief," the third element of the
associational standing test is met. 852 S.W.2d at 448. In the case now before us, the appellee
associations seek only injunctive relief to prevent disclosure of the Quarterly Market Reports. 
There is therefore no necessity for each individual member of the association to establish what
damages it will probably sustain in order to obtain relief. In addition, the appellee association
raises only the issue of whether statutory exceptions to the Public Information Act apply to the
Quarterly Market Reports. This issue might properly be termed a mixed question of fact and law,
because it is necessary to establish that the insurers will each in fact suffer competitive harm
before it becomes necessary to determine whether the Quarterly Market Reports amount to trade
secrets or confidential commercial or financial information. See Apodaca v. Montes, 606 S.W.2d
734, 736 (Tex. App.--El Paso 1980, no writ). The trial court, however, apparently believed that
Dr. Welch's testimony established that harm will probably befall any automobile insurer should
the reports be released. The trial court was entitled to so appraise and credit Welch's testimony. 
We therefore hold that the third element of the associational standing test is met, and that the trial
court did not exceed its jurisdiction or abuse its discretion by enjoining the release of member
insurers' Quarterly Market Reports.

 Expert Testimony. In his fourth issue on appeal, Birnbaum argues that the trial
court abused its discretion by receiving over his objection the testimony of Dr. Welch. He argues
that appellees failed to disclose in a timely fashion before trial the opinions of Dr. Welch. In
addition, he argues that appellees failed to identify the consulting experts upon whose work
product Dr. Welch based his opinions. 

 In their answers to interrogatories, appellees disclosed that Dr. Welch would give
his opinions as to the competitive nature of the automobile-insurance market in Texas, the value
of Quarterly Market Reports to appellees and their competitors, the harm appellees will probably
sustain if the Quarterly Market Reports are disclosed, and whether Quarterly Market Reports are
trade-secret and confidential information. Appellees also offered Birnbaum an opportunity to
depose Dr. Welch, which Birnbaum refused. (22) Birnbaum asked instead for an expert report. 
Appellees furnished the ten-page expert report to Birnbaum's counsel at 7:30 p.m. on the last
business day before the hearing.

 Dr. Welch testified during cross-examination that he had made his general factual
observations known to appellees at the time the interrogatories were due. Those factual
observations were not, however, disclosed in answers to interrogatories furnished to Birnbaum. 
Appellees argue that they did provide answers; however, their answers failed to disclose the
factual observations and opinions of Dr. Welch. We find that appellees' answers were
nonresponsive, and a violation of Rule 215(5).

 Rule 215(5) of the Texas Rules of Civil Procedure mandates the exclusion of expert
testimony when a party has failed to respond to or supplement responses to discovery. See Tex.
R. Civ. P. 215(5). An exception exists when a party shows good cause for admitting the evidence. 
See id. The trial court decides in its discretion whether a party has established good cause. See
DeWitt v. Prudential Ins. Co. of Am., 717 S.W.2d 414, 417 (Tex. App.--Houston [14th Dist.]
1986, no writ). The scope of review is whether the court abused its discretion. Alvarado v. Farah
Mfg. Co., 830 S.W.2d 911, 914 (Tex. 1992).

 At the temporary-injunction hearing, appellees' counsel offered several reasons why
Dr. Welch should be allowed to testify. Counsel explained the substance of the interrogatory
answers to establish that there was no surprise regarding the nature of Dr. Welch's proposed
testimony. Counsel also noted that she had informed Birnbaum's attorney before the answers were
due that Dr. Welch would be a witness, and offered him the opportunity to take Dr. Welch's
deposition. She stated that she had been apologetic about the lateness of the report, that it resulted
from their own delay in receiving the report, and that in the interest of creating a "fair playing
field" she disclosed to Birnbaum's counsel who the remaining witnesses would be and the order
in which they would be called. She stated that the expert report was only ten pages long.

 The trial court may reasonably have concluded from the record that Birnbaum had
adequate opportunity to learn the opinions of Dr. Welch. Although the interrogatory answers
were certainly not responsive in any meaningful way, they did provide Birnbaum notice of the
topics of the expert's testimony. As appellees' counsel noted, cross-examination would provide
Birnbaum an opportunity to examine and test the substance of the expert report. Under these
circumstances, we cannot conclude that the trial court's admission of Dr. Welch's testimony was 
an abuse of discretion. We therefore overrule Birnbaum's fourth issue on appeal. (23)

 Irreparable Harm. In Birnbaum's fifth point of error, he contends the trial court
abused its discretion in finding that appellees would suffer irreparable injury absent a temporary
injunction. Appellees' witnesses testified that releasing the Quarterly Market Reports information
to the public would divulge the following to competitors: (1) volume of revenue per ZIP code;
(2) market share per ZIP code; (3) market share changes over time; (4) revenue changes over time;
(5) average value of automobiles insured per ZIP code; (6) demand for a particular insurance
product in a specific area; and (7) liability limits of policies sold per ZIP code. The witnesses
concluded that from this information, competitors could develop marketing plans and business
strategies that would mimic the more successful strategies and avoid less successful strategies. 
Competitors could then identify and prey upon any specific geographic business of an insurer
against whom they compete particularly well. In addition, when combined with census
information, the Quarterly Market Report information could help competitors determine specific
characteristics of customers. According to Dr. Welch, release of the Quarterly Market Reports
on either a one-time or a quarterly basis would result in substantial competitive injury to affected
companies.

 After reviewing the record, we find the evidence of probable harm is largely
conclusory. No evidence demonstrated how, as a practical matter, the release of written premiums
and the change in vehicles insured over time per ZIP code (24) could give competitors any real
advantage over one another. (25) The information is not customer-specific. In addition, as Dr.
Welch acknowledged, a competitor would have to factor out the effect of all other marketing
strategies to evaluate the effectiveness of any particular strategy indicated by the Quarterly Market
Reports. The information contained in the Quarterly Market Reports, however, includes TAIPA
data, meaning that the information includes not only customers who buy on the free market, but
customers who are assigned from the high-risk pool. Thus, the information in the Quarterly
Market Reports does not isolate customers who are the target of a particular marketing strategy. 
It would seem, moreover, that the release of all Quarterly Market Reports would leave all
insurance companies in the same position, with no one company having an advantage that others
did not have. See Apodaca, 606 S.W.2d at 736. 

 However, we may not reverse a temporary injunction for abuse of discretion merely
because we disagree with a trial court decision. See Beaumont Bank, N.A. v. Buller, 806 S.W.2d
223, 226 (Tex. 1991); Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985),
cert. denied, 476 U.S. 1159 (1986). We must "draw all legitimate inferences from the evidence
in the light most favorable to the trial court's judgment." Keystone Life Ins. Co. v. Marketing
Management, Inc., 687 S.W.2d 89, 91 (Tex. App.--Dallas 1985, no writ). Appellees produced
three witnesses who testified as to the harm that would probably result from release of the two
Quarterly Market Reports. The trial court had broad discretion to infer findings of fact from the
conflicting evidence presented. We cannot say as a matter of law that the court was unreasonable
in the facts found. We therefore overrule Birnbaum's fifth point of error.

 Section 552.110: Trade Secrets and Confidential and Privileged Information. 
Birnbaum contends that the trial court erred in finding that section 552.110 applied to the
Quarterly Market Reports. In his order, the trial judge found that "the Quarterly Market Report
Data constitute . . . trade secrets and confidential commercial or financial information that is
excepted from disclosure and is privileged and confidential under § 552.101, et seq., of the Texas
Government Code."

 A trade secret is "any formula, pattern, device or compilation of information which
is used in one's business, and which [provides] an opportunity to obtain an advantage over
competitors who do not know or use it." Hyde Corp. v. Huffines, 314 S.W.2d 763, 766, cert.
denied, 358 U.S. 898 (1958) (adopting the Restatement of Torts, § 757, cmt. b (1939)). The party
claiming the trade secret has the burden of establishing its existence, and its value to the owner. 
See Chapa v. Garcia, 848 S.W.2d 667, 670 (Tex. 1992) (applying discovery privilege for trade
secrets). Six factors must be established by a claimant, including:


(1) the extent to which the information is known outside his business; (2) the extent
to which it is known by employees and others involved in his business; (3) the
extent of the measures taken by him to guard the secrecy of the information; (4) the
value of the information to him and his competitors; (5) the amount of effort or
money expended by him in developing the information; (6) the ease or difficulty
with which the information could be properly acquired or duplicated by others.



Id. (quoting the Restatement of Torts § 757, cmt. b, at 6).

 During the trial, Birnbaum essentially conceded that five of the six factors were
easily satisfied in the present case. (26) After so doing, Birnbaum cannot now object that members
of the associations did not present evidence as to those five factors. Birnbaum's primary
contention is that the testimony of Dr. Welch did not reasonably justify a conclusion that
competitors would gain an unfair competitive advantage from release of the disputed information.

 Whether release of the Quarterly Market Report information will probably result
in harm sufficient to give competitors an advantage over appellees is a mixed question of law and
fact. The trial judge is entitled to reserve difficult questions of law and fact for full development
at trial on the merits. See Keystone Life Ins. Co., 687 S.W.2d at 92. "The ruling on the
temporary injunction may not be used to obtain an advance ruling on the merits; the question to
be decided on appeal is whether the trial court abused its discretion in granting or denying the
temporary injunction." Iranian Muslim Org., 615 S.W.2d 202, 208 (Tex. 1981). As discussed
above, the trial court could reasonably conclude that Dr. Welch's testimony had shown the
probability of a risk of imminent, irreparable harm should the Quarterly Market Report
information be released.

 The second part of section 552.110 excepts from disclosure "commercial or
financial information obtained from a person and privileged or confidential by statute or judicial
decision." Tex. Gov't Code Ann. § 552.110. Birnbaum argues that the trial court abused its
discretion because the Quarterly Market Report information is not made confidential by judicial
decision or statute. 

 There is a dispute concerning the proper scope of the exception. Appellees claim
that the proper scope is that adopted by federal courts for interpreting the Freedom of Information
Act. In National Parks and Conservation Association v. Morton, the court stated that information
is confidential within the meaning of the exception if disclosure is likely either: (1) to impair the
government's ability to obtain necessary information in the future; or (2) to cause substantial harm
to the competitive position of the person from whom the information was obtained. 498 F.2d 765,
766 (D.C. Cir 1974). 

 Birnbaum claims that the federal interpretation is inapposite because the Texas
Legislature provided an explicit measure for determining whether information is privileged and
confidential. Unlike its federal counterpart, section 552.110 excepts information that is
"confidential or privileged by judicial decision or statute." Tex. Gov't Code Ann. § 552.112
(emphasis added); cf. 5 U.S.C. § 552(b)(4) (1996). Birnbaum argues that no statute or judicial
decision has made Quarterly Market Report information privileged or confidential; consequently,
the information is not exempt from disclosure. Appellees assert that the language in the Texas
statute merely codifies the objective standard that courts have since held is implied in the federal
statute. Furthermore, they contend that National Parks is a judicial decision within the meaning
of section 552.112. In support, they cite an opinion of the Attorney General stating that if a
government body can meet the test established by National Parks, the exception in section 552.110
is established. See Tex. Att'y Gen. ORD-652 (1997); see also Apodaca, 606 S.W.2d at 736
(applying the National Parks test to the disclosure of financial statements relating to a bail-bond
permit).

 We reject the National Parks rationale. Section 552.110 is certain and clear in its
reference to information made confidential or privileged by statute or judicial decision. Appellees'
contention that National Parks is a judicial decision within the meaning of section 552.110 is
without merit in our view. National Parks created a standard of statutory construction for a statute
that lacked any stated measure of what constituted confidential information. The Texas statute
includes an explicit measure of what constitutes confidential information; there is therefore no
need to inquire further respecting this aspect of the legislative intention.

 Appellees apparently do not dispute that the Quarterly Market Report information
has not been made confidential by statute or judicial decision. We therefore modify the temporary
injunction order insofar as it excepts Quarterly Market Report information from disclosure under
the second element of section 552.110. We affirm, however, the court's temporary injunction
order with respect to the Quarterly Market Report information on the basis that it constitutes trade
secrets. (27)

Conclusion

 Because we hold that the Quarterly Market Report information is not excepted by
section 552.112 of the Texas Public Information Act, we reverse the trial court's summary
judgment and dissolve the permanent injunction. We hold that the Quarterly Market Report
information is not made confidential and privileged by statute or judicial decision, within the
meaning of section 552.110 of the Act. However, we find that the trial court did not abuse its
discretion in granting a temporary injunction on the ground that the Quarterly Market Report
information amounts to trade secrets. We affirm that part of the trial court judgment issuing a
temporary injunction on the ground that the Quarterly Market Report information constitutes trade
secrets, but modify the temporary injunction to allow the disclosure of information supplied by
nonparty insurers and to delete that part of the order authorizing disclosure of information to
TAIPA.



 

 John E. Powers, Justice

Before Justices Kidd, B. A. Smith and Powers*

Modified and, as Modified, Affirmed in Cause No. 03-97-00660-CV;

Reversed and Injunction Dissolved in Cause No. 03-98-00208-CV

Filed: May 20, 1999

Publish



* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty
Company, and State Farm County Mutual Insurance Company of Texas are designated as "other
parties" in the first cause and as "appellees" in the second cause. All other insurance companies
and trade associations designated as "appellees" in the first cause are also "appellees" in the
second cause. These entities include National Association of Independent Insurers, Alliance of
American Insurers, United Services Automobile Association, USAA Casualty Insurance Company,
USAA County Mutual Insurance Company; Texas Farmers Insurance Company, American Fire
and Casualty Company, Farmers Texas County Mutual Insurance Company, Mid-Century
Insurance Company of Texas, Ohio Casualty Insurance Company, Ohio Security Insurance
Company, and Western American Insurance Company. To simplify the text, we will refer to all
insurers and trade associations involved in the present consolidated appeal as "appellees."
2. We shall refer collectively to the Attorney General and the Commissioner as "the State
officials."
3. Under the authority and requirements of Insurance Code article 21.81, section 3(e), the
Department has determined and designated by rule underserved geographic areas. See 28 Tex.
Admin. Code Ann. § 5.206 (a)-(e) (1998). Specific ZIP Codes are designated "underserved"
based on "the availability of insurance, the number of uninsured drivers, the number of drivers
insured through [TAIPA], and any other relevant factor." Tex. Ins. Code Ann. art. 21.81, § 3(e)
(West Supp. 1999). The formula for analyzing availability is "the share of average vehicles on
policies in force in assigned risk and non-standard markets as a percentage of total average
vehicles on policies in force by ZIP Code." 28 Tex. Admin. Code § 5.206(g) (1998)
.
4. The system for compelling insurance carriers to provide liability coverage to high-risk
drivers is known as the "assigned risk plan." TAIPA administers the assigned risk plan. See
Office of Pub. Ins. Counsel v. Texas Auto. Ins. Plan, 860 S.W.2d at 233 (Tex. App.--Austin
1993, writ denied).
5. The administrative rule designating "underserved" ZIP Codes divides them into five
categories. See 28 Tex. Admin. Code § 5.206 (a)-(e) (1998). The TAIPA plan of operation
specifies that the category number refers to the number of credits awarded an insurer for each
eligible insured vehicle in the ZIP Code. For example, no credits are awarded for eligible insured
vehicles in a Category 0 ZIP Code while four credits are awarded for an eligible insured vehicle 
in a Category 4 ZIP Code. Furthermore, only vehicles insured at rates at or below the TAIPA
rate set by the Commissioner are eligible for both basic and quota credits. As stated in the Texas
Register, "The premise is that consumers do not benefit from a voluntary writing at rates above
the TAIPA rate, so credits should not be earned for writing at non-standard rates." 20 Tex. Reg.
334 (1995).
6. The Statistical Plan states, "For the Quarterly Market Report, the location of vehicles
is defined as the garage address of the vehicle and not the mailing address of the insured"
(emphasis in original).
7. The Statistical Plan defines "written premium" as "total gross premium excluding policy
and membership fees and less return premium and premium on policies not taken" (emphasis in
original).
8. A Quarterly Market Report must account for changes in the number of vehicles insured
by listing four elements: vehicles added in the quarter, vehicles canceled or non-renewed at the
insurer's initiative, vehicles canceled for non-payment of premium, and vehicles canceled at the
insured's initiative.
9. The State officials do not contest that insurers are "financial institutions" for the
purposes of section 552.112.
10. See Tex. Prop. Code. Ann. §§ 141.002(7), 162.005(5) (West Supp. 1999); Tex. Gov't
Code Ann. § 481.401(2) (West 1998); Tex. Rev. Civ. Stat. Ann. art. 360, § 1(2) (West Supp.
1998); Tex. Fin. Code. Ann. §§ 15.204(c), 31.002(a)(25), 59.301(7), 91.002(14), and
302.105(b)(1) (West 1998); Tex. Bus. & Com. Code Ann. § 26.02(a)(1) (West. Supp. 1999); Tex.
Civ. Prac. & Rem. Code Ann. § 30.007(a)(2) (West 1997); Tex. Ins. Code Ann. art. 21.57(a)(2)
(West Supp. 1999); Tex. Prob. Code Ann. § § 241(b), 436(3) (West Supp. 1999).
11. Tex. Penal Code Ann. § 32.01(1) (West 1994); Tex. Rev. Civ. Stat. Ann. art. 1528g,
§ 1(3) (West 1997).
12. See Webster's Third New International Dictionary 851 (Philip B. Gove ed., 1981);
Black's Law Dictionary 630 (6th ed. 1990).
13. See, e.g., Tex. Fin. Code Ann. §§ 15.204, 59.202 & 59.301 (West 1998) (relating to 
regulation of banking firms); Tex. Gov't Code Ann. § 481.401 (West 1998) (enacting program
to secure loans to business and non-profit organizations).
14. The case of Rainbow Group, Ltd. v. Texas Employment Commission, 897 S.W.2d 946
(Tex. App.--Austin 1995, writ denied), is consistent with this general rule. In Rainbow Group,
we assumed that the legislature adopted an Attorney General interpretation when it recodified a
Texas statute that had been construed in an Attorney General Open Records Decision. See id. at
949. In that case, there was specific evidence that the legislature had taken notice of the Attorney
General opinion interpreting the statute when the legislature modified the statute using language
from the opinion. See id. In the case at bar, by contrast, the language of the state exemption is
taken verbatim from the language of an exemption in a federal statute, and there is no evidence
that the legislature incorporated Attorney General opinions into its intended meaning of the term
"financial institution."
15. See Tex. Att'y Gen. ORD-158 (1977) (citing Tex. Bus. Code Art. 1528(g)).
16. While the court in Consumers Union seemed to acknowledge that harm to financial
institutions could encompass competitive harm from other banks, see Consumers Union of United
States, Inc. v. Heimann, 589 U.S. 531, 540 (D.C. Cir. 1978), we believe the exception for trade
secrets is more pointedly designed to protect against such harm. See Tex. Gov't Code Ann.
§ 552.110 (West 1994). Historically, federal courts have been willing to limit the scope of the
Freedom of Information Act. Texas courts have declined to follow suit. See Industrial Found.
of the South, Inc. v. Texas Indus. Accident Bd., 540 S.W.2d 668, 682 (Tex. 1976) ("We decline
to adopt an interpretation which would allow the court in its discretion to deny disclosure even
though there is no specific exemption provided."); Texas Dep't of Pub. Safety v. Gilbreath, 842
S.W.2d 408, 413 (Tex. App.--Austin 1992, no writ).
17. Our decision that insurance companies are not "financial institutions" for the purposes
of section 552.112 renders it unnecessary for us to determine whether Quarterly Market Reports
are operating or condition reports within the meaning of section 552.112.
18. AIPSO, an agent of TAIPA, is not discussed in the record. We will refer to both
entities as "TAIPA."
19. We note that section 552.008 of the Texas Public Information Act authorizes an
individual member, agency, or committee of the legislature to obtain information otherwise exempt
if it states that the information is requested for legislative purposes. See Tex. Gov't Code Ann.
§ 552.008(b) (West Supp. 1999). We find no authority for the proposition that TAIPA is a
legislative body within the meaning of section 552.008, notwithstanding the fact that TAIPA owes
its existence to a legislative enactment.
20. We note, however, that nothing would prevent the information from being turned over
to a legislative member, body, or agency. See Tex. Gov't Code Ann. § 552.008(b) (West Supp.
1999).
21. Our decision does not restrict the right of appellees to submit briefs to the Attorney
General asserting reasons why Quarterly Market Reports generally should not be disclosed. The
Texas Public Information Act allows "[a] person whose interests may be involved [in the request
for information], or any other person, [to] submit in writing to the attorney general the person's
reasons why the information should be withheld or released." Tex. Gov't Code Ann. §
552.305(b) (West 1994) (emphasis added).
22. Birnbaum observes that for a member of the public, interested merely in enforcing the
Public Information Act, the cost of depositions is prohibitive.
23. Birnbaum also argued that appellees' failure to designate Jim Pierce as a consulting
expert was error. During the trial, Dr. Welch disclosed that in producing his expert report, he
relied to some extent on a draft of an opinion by Jim Pierce. The record is not sufficiently clear
to establish that Jim Pierce was actually a consulting expert. We overrule the point of error.
24. State Farm waived its objections to the release of change of vehicles insured per ZIP
code, asking for an injunction only with respect to the release of written premium information. 
25. Appellees emphasize at various points in their brief the value that data regarding sales
per ZIP code has in providing information to competitors of their market share in small geographic
areas. In doing so, appellees also implicitly underscore the compelling purpose behind the
creation of TAIPA and making this information public, which is to track where companies are
selling insurance to ensure that there is not a negative correlation between a community's minority
population and the availability of automobile insurance coverage in the standard market.
26. As an example of his contention, Birnbaum explained that the number of pencils a
company uses could easily fit the exceptions for information not known outside a company,
information that would not be generally known within the company, information that would be
protected because it would be part of the operating budget, information that could not be easily
discovered, and information that the company expended a significant amount of money to protect
due to the costs of the computers and software used to develop an accounting system.
27. Birnbaum raises two final points of error. First, he asserts that the district court abused
its discretion by failing to conduct a substantial evidence review of Rule 5.206 of the Texas
Insurance Code, which provides that "[u]pon request, the Department shall publish a listing of the
number of average vehicles on policies in force by company by ZIP Code in this state." Tex. Ins.
Code Ann. art. 1.04(a) (West Supp. 1999). Appellees rejoin that the rule is invalid, because the
Commissioner of the Department of Insurance has no authority to promulgate rules not authorized
by statute. See Tex. Ins. Code Ann. art. 1.03A (West 1993). We need not review the validity
of the rule because we hold that a rule cannot authorize release of information that is mandatorily
excepted from disclosure by statute. Cf. Indus. Found. of the South, Inc., 540 S.W.2d at 677.


 Second, Birnbaum argues that the district court abused its discretion in failing to enter
findings of fact and conclusions of law in response to his timely request. See Tex. R. Civ. P. 297. 
A trial court's duty to file findings and conclusions is mandatory. See id.; Cherne Indus., Inc. v.
Magallanes, 763 S.W.2d 768, 772 (Tex. 1989). The failure to comply with a request to enter
findings and conclusions "is presumed harmful unless the record 'affirmatively shows that the
complaining party suffered no injury.'" Southwest Airlines Co. v. Texas High-Speed Rail Auth.,
867 S.W.2d 154, 160 (Tex. App.--Austin 1993, writ denied) (quoting Cherne Indus., Inc., 763
S.W.2d at 772). In this case, we believe that Birnbaum was not burdened by the trial court's
failure. In his briefs to this Court, Birnbaum identified and rebutted the theories by which the trial
court might have arrived at its decision to grant a temporary injunction. We therefore find no
injury that would justify a remand.